CARAWAY, J.,
concurring.
_JjThis ruling, finding error in the trial court’s absolute dismissal of plaintiffs’ claims, suggests that a cause of action for fraud may be present. I concur with that possibility. The petition nevertheless is somewhat vague on the facts of the parties’ communications (or lack thereof) over the sale to defendant operator of lessors’ stated royalty in their oil and gas lease.
Before reviewing the meager allegations of the parties’ communications, the defendant’s own statements in its May 9, 2006 press release are telling. It states:
Natural Gas Systems, Inc. (http://www. natgas.us/) acquires and develops oil and gas resources and applies conventional and specialized technology to accelerate production and develop incremental reserves. NGS owns a 100% working interest in the 18,686 acre Delhi Field in northeastern Louisiana and a 100% working interest in small fields in north central Louisiana.
* * * * * *
Since its discovery in 1945, the Delhi Unit has produced approximately 190 million barrels of oil, which NGS estimates to be less than half of the original oil in place in the targeted reservoirs. ⅜ ⅜ ⅜: ⅜ ⅜ ⅜
Denbury has estimated that its capital expenditures in the overall project will likely reach or exceed $200 million and that potential reserves are estimated to range between 30 and 40 million barrels of oil, net to Denbury’s interests.
From these statements, since Denbury is reported as receiving an “80% net revenue interest in the Delhi Unit,” its estimated 40 million barrels would be derived from a 50 million barrel total production from which the plaintiffs’ royalty would have been paid. In fact, the petition alleges that after the tertiary C02 flooding actually commenced in 2010, the expected recoverable reserves increased to over 60 million barrels.
|2When considered with the plaintiffs’ alleged unit decimal interest for their royalty of .00204812 and an assumption of $90 per barrel, the plaintiffs’ royalty potential for the targeted reserves before the sale would be calculated at $9,216,540 (50 millions barrels x $90 x .00204812). The plaintiffs therefore allege that they were paid $25,816 for the sale when the operator knew their royalty interest might be expected to receive over $9 million from the known recoverable reserves.
Under Article 122 of the Mineral Code, La. R.S. 31:122, the question is whether disclosure of the planned enhanced recovery operation for the in place reserves was required because of the operator’s existing obligation or duty to act as a reasonably prudent operator for the parties’ mutual benefit. In considering that duty, the official comment to Article 122 states that an operator may be found to breach the duty if he fails to reasonably develop a known producing formation. In Wadkins v. Wilson Oil Corp., 199 La. 656, 6 So.2d 720 (1942), cited under Article 122, the lease was cancelled because the lessee did not employ “the new and successful methods of development used by others in this chalk rock stratum oil field.”
Defendant’s position, however, is that despite its duty under Article 122, its silence on the subject of enhanced recovery cannot amount to fraud. In this respect, the petition is vague and incomplete. The petition never alleges direct misrepresentations by the defendant that the reserves in the fieldwide unit were virtually depleted. There was apparently a solicitation letter at some unreported time before the sale. Neither the date of that letter nor the sale date is identified, and the content of the letter and any oral ^discussion are not detailed.. The allega *456 tion that the $25,816 sales price was calculated from the total royalties paid to plaintiffs for the previous 16 years might circumstantially indicate a declining reservoir nearing depletion. Yet, the petition is unclear on how the exchange between the parties’ over the price was communicated.
In summary, the operator apparently knew the facts because it was acting (in part under the compulsion of its obligation to plaintiffs) as an informed and diligent lessee. It obtained those facts utilizing all prior engineering and production results developed from data gathered from the unit and plaintiffs’ property with which it had to act for their mutual benefit. I concur in the result that a cause of action is a possibility upon clarifying allegations by plaintiffs of the parties’ dealings.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY and PITMAN, SEXTON (Pro Tempore), JJ.
Rehearing denied.
SEXTON, Judge Pro Tempore, would grant rehearing.